IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

CHUCK VOGEL, et al.

**Plaintiffs**

v.

UNIVERSAL INSURANCE COMPANY, et al.

**Defendants**

**CIVIL NO.** 18-1706(RAM)

## OPINION AND ORDER

RAÚL M. ARIAS-MARXUACH, District Judge

This matter comes before the Court on Plaintiffs' Chuck Vogel, Juanita Vogel and Casa La Roca LLC's and co-defendant Universal Insurance Company's cross motions for summary judgment. (Docket Nos. 110 and 113). Having reviewed the parties' submissions (Docket Nos. 126-128, 132, 144-146), the Court **DENIES** Plaintiffs' *Motion for Summary Judgment on the Coverage Issue* at Docket No. 110 and **GRANTS** Defendant's *Motion for Summary Judgment* at Docket No. 113.

### I. BACKGROUND

Chuck Vogel, Juanita Vogel, and Casa La Roca LLC (collectively "Plaintiffs") are the owners of three (3) properties in Fajardo, Puerto Rico that were insured by co-defendant Universal Insurance Company ("Defendant" or "Universal"), under Policy No. UNPK018079. (Docket No. 84 ¶¶ 11, 14, 16). In 2017, the properties suffered extensive hurricane damage prompting Plaintiffs to file various

claims seeking payment from Universal. Id. ¶¶ 30-31. Universal denied the claims after learning that the properties were being used for business purposes, namely rentals to third-parties, and thus excluded from coverage pursuant to the policy. Id. ¶ 43.

On September 9, 2018, Plaintiffs filed a lawsuit against Universal, their insurance broker Ramón Enrique Ramos-Coll ("Mr. Ramos-Coll"), as well as other unnamed defendants, for alleged breach of contract, unjust enrichment, negligent brokerage and damages. (Docket No. 1). On November 9, 2018, Plaintiffs filed an *Amended Complaint* incorporating a request for declaratory judgment against Universal. (Docket No. 12). Subsequently, Plaintiffs voluntarily dismissed their claims against Mr. Ramos-Coll, without prejudice. (Docket Nos. 34 and 35). On September 6, 2019, Plaintiffs filed a *Third Amended Complaint*, amending the jurisdictional allegations related to Casa La Roca LLC pursuant to Court orders at Docket No. 80. (Docket No. 84). Accordingly, on September 20, 2019, Universal filed their *Answer to the Third Amended Complaint*. (Docket No. 90).

On December 5, 2019, Plaintiffs filed a *Motion for Summary Judgment on the Coverage Issue*, along with a *Statement of Uncontested Material Facts in Support* of the same, affirming that the properties qualify for coverage under the insurance policy issued by Universal. (Docket Nos. 110 and 111). Defendant opposed them on February 21, 2020. (Docket Nos. 128 and 132).

On their part, Universal filed a *Motion for Summary Judgment* alleging that the commercial use of the properties, rather than residential, entitled Universal to deny coverage. (Docket No. 113). In the alternative, Universal argues that: (1) Plaintiffs have not recorded the actual cost of repairs, as required by the insurance contract; and (2) the damages Plaintiffs sought for hurricane María are instead attributable to hurricane Irma. Id. Defendant accompanied said *Motion for Summary Judgment* with a *Statement of Uncontested Material Facts*. (Docket No. 114). In response, on February 21, 2020, Plaintiffs filed an *Opposing Statement of Facts and Additional Statement of Facts* as well as a *Memorandum of Law in Support of their Opposition* (Docket Nos. 127 and 126, respectively). Universal replied to both oppositions on April 10, 2020. (Docket Nos. 144 and 145).

## II. LEGAL STANDARD

### A. Summary Judgment Standard under Fed. R. Civ. P. 56

Summary judgment is proper under Fed. R. Civ. P. 56(a) if a movant shows "no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." A genuine dispute exists "if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." Alicea v. Wilkie, 2020 WL 1547064, at *2 (D.P.R. 2020) (quotation omitted). A fact is material if "it is relevant to the resolution of a controlling legal issue raised by the motion for

summary judgment." <u>Bautista Cayman Asset Co. v. Terra II MC & P, Inc.</u>, 2020 WL 118592, at *6 (D.P.R. 2020) (quotation omitted).

The party moving for summary judgment "bears the initial burden of showing that no genuine issue of material fact exists." <u>Feliciano-Munoz v. Rebarber-Ocasio</u>, 2020 WL 4592144, at *6 (1st Cir. 2020) (citation omitted). Whereas the non-movant may "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." <u>Robinson v. Town of Marshfield</u>, 950 F.3d 21, 24 (1st Cir. 2020) (quotation omitted). However, it "cannot merely 'rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute.'" <u>Feliciano-Munoz</u>, 2020 WL 4592144, at *6 (quoting <u>McCarthy v. Nw. Airlines, Inc.</u>, 56 F.3d 313, 315 (1st Cir. 1995)). Solely relying on "conclusory allegations, improbable inferences, and unsupported speculation" is insufficient to defeat summary judgment. <u>River Farm Realty Tr. v. Farm Family Cas. Ins. Co.</u>, 943 F.3d 27, 41 (1st Cir. 2019) (quotation omitted).

Local Rule 56 also governs summary judgment. *See* L. CV. R. 56. Per this Rule, a nonmoving party must "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." <u>Id.</u> The First Circuit has stated that adequately supported facts "shall be deemed admitted unless controverted in

the manner prescribed by the local rule." <u>Advanced Flexible
Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH</u>, 781 F.3d
510, 520 (1st Cir. 2015) (quotation omitted). Hence, "litigants
ignore Local Rule 56 at their peril." <u>Calderón Amézquita v. Vices</u>,
2019 WL 3928703, at *1 (D.P.R. 2019) (citation omitted).

### III. FINDINGS OF FACT

After analyzing Plaintiffs' SMUF (Docket No. 111),
Universal's opposition thereto (Docket No. 132), Universal's SMUF
(Docket No. 114), Plaintiffs' opposition thereto and additional
facts (Docket No. 127) and Universal's reply to the additional
facts (Docket No. 145), and **only crediting material facts** that are
**properly supported by a record citation and uncontroverted**, the
Court makes the following findings of facts:[1]

#### A. <u>Universal Insurance Company Underwriting in General</u>

1.  Universal is an insurance company authorized by the
    Insurance Commissioner of Puerto Rico to sell insurance
    policies for automobiles, personal and commercial
    property and contingency. (Docket No. 114 ¶ 1).

2.  Universal's property insurance area is divided in two mayor
    underwriting divisions: personal property lines and
    commercial property lines. <u>Id.</u> ¶ 3.

---

[1] References to a Finding of Fact shall be cited as follows: (Fact ¶ _).

3. The two divisions have separate underwriters, policy forms, rating procedures, and marketing methods, among other things. Id. ¶ 4.

4. The underwriting process in Universal is separated between personal lines and commercial lines because the exposures to loss associated to the nature and use given to personal property that is being used for residential purposes is very different from the exposure to a loss associated with the nature and use given to property that is being used to operate a business. Id. ¶ 2.

5. Universal provides a wide range of commercial insurance coverage against damages or losses stemming from several risks that could affect a business' capacity to operate normally, such as: building or structure coverage; business interruption; extraordinary expenses; and theft of business sales revenue, business personal property or contents, among others. Id. ¶ 5.

6. Under its commercial lines, Universal provides insurance coverage against damages to the structure, losses of contents and losses business income for short-term rental businesses such as hotels, hostels, motels, villas, inns, guesthouses, Airbnbs, and others in Puerto Rico. Id. ¶ 6.

7.   Universal also provides a wide variety of personal insurance coverage against damages or losses stemming from several risks that could affect property that is used *exclusively* for personal purposes, such as: automobiles, dwellings (homeowners), other (appurtenant) structures, personal property or contents, and additional living expenses, among others. Id. ¶ 7.

8.   Under its personal lines, Universal's homeowner's insurance policy provides dwelling coverage for property used exclusively for personal residential purposes. Id. ¶ 8.

9.   Universal offers a personal property protection package known as the "Universal Personal Protection Package" or "UniPak Personal" in which a customer may purchase personal liability and umbrella coverage for their automobile, home ("dwelling"), secondary residence(s), appurtenant structures, and other personal property under one policy. Id. ¶ 9.

**B. Plaintiffs' properties and personal protection package policy**

10.   Chuck Vogel and his wife, Juanita Vogel, ("the Vogels" or "Plaintiffs") are residents of the state of Florida. Id. ¶ 10.

11.   In May 2006, the Vogels purchased a property located at 181 Calle B Urbanización La Roca, Fajardo, Puerto Rico

("La Roca I"). Id. ¶ 11.

12.   In June 2006, the Vogels purchased a Homeowner's insurance
      policy #88HO814328 with Universal through their insurance
      broker, Mr. Ramón E. Ramos-Coll ("Mr. Ramos") with the
      following property coverage for La Roca I: (a) dwelling
      with a limit of $600,000; (b) other structures with a
      limit of $60,000; contents with a limit of $300,000; and
      (d) loss of use with a limit of $120,000. Id. ¶ 12.

13.   Plaintiffs' insurance policy #88HO814328 was renewed
      through Mr. Ramos on a yearly basis until 2010. Id. ¶ 13.

14.   On February 19, 2010, the Vogels applied for a personal
      protection package policy with Universal through Mr.
      Ramos. Id. ¶ 14.

15.   In the personal protection package policy, the Vogels
      obtained coverage for their automobile, and their
      "principal residence" La Roca I in the following amount:
      (a) dwelling with a limit of $3,000,000; (b) appurtenant
      structures with a limit of $300,000; unscheduled personal
      property or contents with a limit of $300,000; and (d)
      additional living expenses with a limit of $600,000. The
      Vogels also obtained coverage for personal liability in
      the amount of $500,000, $5,000 for medical expenses each
      person, and umbrella coverage for $500,000. (Docket Nos.
      114 ¶ 15; 111 ¶ 6).

16.   At all relevant times, Plaintiffs procured and obtained
      the renewal of their insurance policy through Mr. Ramos.
      (Docket No. 114 ¶ 16).

17.   The coverage for La Roca I was renewed on the same terms
      and for the same amount of coverage from February 2010 to
      February 2018, under the personal protection package
      described above. Id. ¶ 17.

18.   In July 2010, Plaintiffs purchased the property located
      at 180A Calle B Urbanización La Roca, Fajardo, Puerto Rico
      ("La Roca II"). Id. ¶ 18.

19.   La Roca II was included via a Secondary Residence Premises
      Endorsement in Vogels' personal protection package as a
      **second non-rented residence** with the following coverage:
      (a) dwelling with a limit of $500,000; (b) appurtenant
      structures with a limit of $50,000; (c) additional living
      expenses with a limit of $100,000; (d) personal liability
      with a limit of $500,000; and (e) umbrella coverage with
      a limit of $500,000. The Vogels did not purchase coverage
      for unscheduled personal property or contents for La Roca
      II. (Docket Nos. 114 ¶ 19; 111 ¶ 7, 111-1 at 59, 75).

20.   The insurance coverage for La Roca II was renewed on the
      same terms and for the same amount on a yearly basis from
      2010 to February 2018. (Docket No. 114 ¶ 20).

21.  In May 2012, Plaintiffs purchased the property located at
     180B Calle B Urbanización La Roca, Fajardo, Puerto Rico
     ("La Roca III"). Id. ¶ 21.

22.  In 2013, La Roca III was included via a Secondary Residence
     Premises Endorsement in the Vogels' personal protection
     package as a **second non-rented residence** with the
     following limits of liability: (a) dwelling with a limit
     of $100,000; (b) appurtenant structures with a limit of
     $10,000; and (d) additional living expenses with a limit
     of $20,000. The Vogels did not purchase coverage for
     unscheduled personal property or contents for La Roca III.
     Id. ¶ 22.

23.  "Section II – Property Coverage Part" of the insurance
     policy identifies La Roca I as a "one story one family all
     superior dwelling."  (Docket No. 111-1 at 38; 114 ¶ 112)

24.  Pursuant to the Declarations portion of "Section IV-
     Umbrella Coverage Part" of the Policy, la Roca I is
     identified as a principal residence while La Roca II and
     La Roca III are listed as "**non-rented property.**" (Docket
     Nos. 111-1 at 75; 114 ¶¶ 113, 115, 118) (emphasis added).

25.  In the "Secondary Residence Premises Endorsement"
     Plaintiffs' Policy, both La Roca II and La Roca III are
     identified as a "secondary residence." (Docket Nos. 111-
     1 at 59-60; 114 ¶¶ 114, 116).

26.     In 2013, the Vogels transferred the title of the property
        La Roca I to "Casa La Roca, LLC", and via Endorsement to
        the policy, the LLC was included as an additional named
        insured. Nonetheless, they clarified to Mr. Ramos, that
        everything  else  remained  the  same;  the  Vogels  would
        continue to use it as residence and would continue to pay
        all expenses. (Docket No. 114 ¶ 23).

27.     Mr.  Richard  Barclay  ("Mr.  Barclay")  was  in  charge  of
        coordinating  and  handling  the  insurance,  bills  and
        payments for La Roca I, La Roca II and La Roca III with
        Mr. Ramos. Id. ¶ 24.

28.     On January 16, 2015, Mr. Ramos sent an email to Mr. Barclay
        and Mr. Vogel attaching Universal's insurance policy for
        renewal. Among  other  things,  Mr.  Ramos  advised  that,  if
        La  Roca  II  and  La  Roca  III  were  going  to  be  used  for
        "seasonal  rental  [,]  the  liability  of  those  properties
        [had] to be change[d][.]" Id. ¶¶ 25-26.

29.     On January 17, 2015, Mr. Vogel responded to Mr. Ramos'
        January  16,  2015  email  stating  they  would  have  separate
        insurance for all the furnishings and copied Mr. William
        Rivera  ("Mr.  Rivera"),  as  the  person  who  would  be
        coordinating  the  rentals  and  the  insurance,  in  the
        response. Id. ¶ 28.

30.  Mr. Rivera is the owner of International Business Solutions LLC ("IBS") and Ebano 155 Inc. ("Ebano"), companies through which he provided varied services to the Vogels' properties, namely: La Roca I, La Roca II and La Roca III. Id. ¶ 29.

31.  In his deposition, Mr. Rivera identified himself as the property manager in charge of renting Plaintiffs' properties. (Docket No. 114-32 at 8-9).

32.  On January 19, 2015, at 9:42 am, Mr. Barclay responded to Mr. Ramos' January 16, 2015 email and copied Mr. Vogel and Mr. Rivera. Essentially, Mr. Barclay identified some corrections needed in the policy's renewal to reflect the correct addresses of the properties. Mr. Barclay also acknowledged **that if they had rental units, they needed to increase the liability.** Mr. Barclay asked Mr. Ramos "to discuss the policy coverages by phone to make sure they had the appropriate structure, personal property and liability amounts in place." (Docket No. 114 ¶ 30).

33.  On January 19, 2015, at 11:33 am, Mr. Barclay sent an email to Mr. Rivera and Mr. Vogel regarding La Roca II and La Roca III. Among other things, Mr. Barclay asked Mr. Rivera if he had some sort of legal agreement with Mr. Vogel to manage the properties, and whether he had insurance coverage. Mr. Barclay also asked Mr. Rivera if,

once they started receiving rent, he was going to set up
the books to run this through a separate company or how
he was going to handle that. Specifically, Mr. Barclay
advised they wanted to be able to write off the expenses
against the income and, therefore, advised that Mr. Rivera
should set something up like a "separate P Rico LLC" and
maybe set a new bank account for revenue and expense. Id.
¶ 31.

34.    In said email, Mr. Barclay also confirmed that Mr. Vogel
was "ok" at having insurance for La Roca II at $500,000,
and that they did not need coverage for personal property
at that time for La Roca II. Mr. Barclay also advised
raising coverage on La Roca III to $600,000 and asked Mr.
Rivera to inform as to how much coverage would be enough
to protect personal property–appliances, furniture, etc.–
because he wanted to make sure they had sufficient
coverage on all properties and personal property. Id. ¶
32.

35.    On January 20, 2015, Mr. Barclay and Mr. Ramos exchanged
emails confirming various changes for the renewal of the
Vogels' insurance policy for 2015. First, the addresses
of the properties were updated. Second, the limits or
property coverage La Roca III were raised as follows: (a)
the dwelling limit was increased from $100,000 to

$600,000; (b) the appurtenant structures limit was increased from $10,000 to $60,000; (c) the unscheduled personal property limit was increased to $50,000; and (d) additional living expenses were increased to $120,000. Furthermore, coverage for personal liability was also obtained for the amount of $500,00 and umbrella coverage was obtained for the amount of $500,000. (Docket Nos. 114 ¶¶ 33-34; 111 ¶ 8).

36.  The insurance coverage for La Roca III was renewed on the same terms and for the same amount on a yearly basis from 2015 to February 2018. (Docket No. 114 ¶ 35).

37.  In 2016, Universal issued a notification to the Vogels informing them that their Personal Protection Package policy number had changed from 88PK014592 to UNPK018079. Nonetheless, coverage under the insurance policy remained the same. Id. ¶ 36.

38.  After purchasing the property in 2006, the Vogels would visit Puerto Rico and generally stay at La Roca I during all of January and February, and either one or two weeks in March, April and October. Sometimes they would also visit in October and late December. Id. ¶ 38.

39.  In 2015, Mr. Vogel's parents passed away, and the Vogels no longer visited Puerto Rico in April and October like they used to. Id. ¶ 39.

40.   The Vogels have stayed in La Roca II approximately three
      (3) times since they purchased the property in 2010. Id.
      ¶ 40.

41.   On June 1, 2016, Plaintiffs entered a verbal agreement
      with Mr. Rivera and his companies, IBS and Ebano, whereby
      Mr. Rivera utilized Plaintiffs' properties and invested
      resources to conduct a short-term rental business renting
      La Roca I, La Roca II and La Roca III. Id. ¶ 41.

42.   Beginning in 2016, Rentals for La Roca I, La Roca II and
      La Roca III were arranged by IBS utilizing the following
      websites for reservations: Airbnb, HomeAway, VRBO and its
      affiliates such as, for example, Expedia.com and Trivago.
      Id. ¶¶ 42-43.

43.   The price to rent each property typically ranged between
      $1,400 to $3,000 per night, but prices could vary
      depending on additional services ordered by the customer.
      Id. ¶¶ 44-45.

44.   Amenities included: washer and dryer, satellite or cable
      tv, internet, swimming pool, air conditioning, and
      additional onsite services such as massages, private chef,
      chauffer, and concierge among others. Id. ¶¶ 45-46.

45.   In response to a subpoena, the Puerto Rico Tourism Company
      provided monthly room occupancy tax returns for the La
      Roca properties, showing that IBS paid occupancy room

taxes to the Puerto Rico Tourism Company under the innkeeper name "Poppy 47, Inc." for the months of June 2016 to December 2016, and January 2017 to July 2017. Id. (Docket No. 114 ¶ 47; 120-3; 127 ¶ 47).

46. The Vogels' Personal Protection Package Policy No. UNPK018079 was never changed from a personal insurance policy to a commercial insurance policy. (Docket No. 114 ¶ 50).

47. Mr. Vogel admitted to knowing that when he is purchasing insurance, he needs to be truthful about the nature of the property that is going to be insured, the value of the property and the nature of the use he was going to give the property, if it is going to be used for residential purposes or for commercial purposes. Id. ¶ 48.

48. At no time did Mr. Vogel, Mr. Rivera, Mr. Ramos, or anyone else on Vogels' behalf notify Universal that Plaintiffs' properties would be used for short-term rental. Id. ¶ 49.

49. The Vogels' Personal Protection Package Policy No. UNPK018079 was renewed on the same terms and for the same amount of coverage on a yearly basis from year 2016 until February 2018. (Docket Nos. 114 ¶ 37; 111 ¶¶ 1, 4).

C. **Key clauses of Plaintiffs' insurance policy**

50. Plaintiffs' Personal Protection Package Policy No. UNPK018079 (the "Policy" or "Policy No. UNPK018079") was

renewed with the same terms and for the same amount of coverage effective from February 19, 2017 until February 19, 2018. (Docket Nos. 114 ¶ 51; 111 ¶ 1).

51. Thus, Policy No. UNPK018079 was the insurance policy in place at the time hurricanes Irma and María struck Puerto Rico on the 6th and 20th of September 2017. (Docket No. 114 ¶ 52.

52. The Declarations Page of the Policy lists the following as named insureds: Chuck Vogel, Juanita Vogel, and Casa La Roca LLC. (Docket No. 111 ¶¶ 2, 36).

53. Pursuant to certain requirements, the Policy provides property coverage and umbrella coverage for the following three properties owned by Plaintiffs: (1) La Roca I at 181 Calle B Urbanización La Roca, Fajardo, Puerto Rico; (2) La Roca II at 180-A Calle B Urbanización La Roca, Fajardo, Puerto Rico; and (3) La Roca III at 180-B Calle B Urbanización La Roca, Fajardo, Puerto Rico. (Docket Nos. 111 ¶¶ 3, 5, 40; 114 ¶¶ 11, 18, 21, 53).

54. "Section II – Property Coverage Part" of the Policy contains an Agreement clause which states that Universal "will provide the insurance described in this Coverage Part in return for the premium and **compliance with all applicable provisions**." (Docket No. 114 ¶ 53) (emphasis added).

55.   Pursuant to the "Definitions" subsection under Section II
      of the Policy, "'Insured' means you, your spouse and
      residents of your household who are: (1) Your relatives;
      or (2) Other persons under the age of 21 and in the care
      of any person named above." <u>Id.</u> ¶ 54.

56.   Furthermore, the "insured location" is defined as:

            1. The "residence premises", which is
               shown in the Declarations; or
            2. Any premises used by you in connection
               with premises in C.1. above;
            3. Any part of premises:
               a. Not owned by an "insured"; and
               b. Where an "insured" is temporarily
                  residing;
            4. Land owned by or rented to an
               "insured" on which a one or two family
               dwelling is being built as a residence
               for an "insured";
            5. Individual or family cemetery plots or
               burial vaults of an "insured"; or
            6. **Any part of premises occasionally
               rented to an "insured"** <u>**for other than**</u>
               <u>**"business" use**</u>.

      (Docket Nos. 111-1 at 39; 114 ¶ 55) (emphasis added).

57.   Under the Policy, "business" consists of: "1. [a]ny
      activity engaged in for money or other compensation
      including full-time, part-time or occasional trade or
      occupations, except as otherwise permitted in this Section"
      and/or "2. [t]he **occasional rental or holding for rental**
      **of the residences for dwelling purposes**." (Docket No. 114
      ¶ 56).

58.  The "Definitions" subsection provides that the "residence premises" which qualifies as an "insured location" under the Policy consists of:

>   1. The one **family dwelling**, other structures, and grounds; or
>   2. The two, three or four **family dwelling where you reside** in at least one of the family units; or
>   3. That part of any other building: Where **you reside** and which is shown as the "residence premises" in the Declarations.
>   "Residence premises" also means, other structures, and grounds at that location.

Id. ¶ 57.

59.  In its relevant part, "Section II – Coverages" A- Coverage A – Dwelling", states that the Policy covers: "[t]he dwelling on the 'residential premises' shown in the Declarations, including structures attached to the dwelling[.]" Id. ¶ 58.

60.  On the other hand, "Section II -Property Coverages, II – Coverages, B- Coverage B – Other Structures," of the Policy provides that it covers "other structures on the 'residence premises' set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection." Id. ¶ 59.

61.  "Section II-Conditions, V- Conditions, A – Loss Settlement" of the Policy establishes that Universal will settle a loss

caused to a building covered under Coverage A or B (*i.e.* the dwelling or other structures, respectively) at replacement cost without deduction for depreciation, subject to the following:

a. If, at the time of loss, the amount of insurance in this coverage part of the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, **but not more than the least of the following amounts**:

   (1) The limit of liability under this coverage part that applies to the building;

   (2) The replacement cost of that part of the building damaged for like construction and use on the same premises; or

   (3) **The necessary amount actually spent to repair or replace the damaged building.**

b. If, at the time of loss, the amount of insurance in this coverage part of the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amount, but not more than the limit of liability under this coverage part that applies to the building:

   (1) The actual cash value of that part of the building damaged; or

   (2) The proportion of the cost to repair or replace, after application of deductible and without deductible for depreciation, that part of the building damaged, which the total amount of

> insurance in this coverage part on
> the damaged building bears to 80%
> of the replacement cost of the
> building.

Id. ¶ 61.

62.  However, in "Section II-Conditions, V-Conditions, C.
Condition Suspending or Restricting Insurance" the Policy
provides that "**[u]nless otherwise <u>provided in writing added</u>
<u>hereto</u>, this company shall not be liable for loss occurring
while the hazard is increased by any means within the
control or knowledge of the insured**." (Docket No. 111-1 at
48).

63.  The Policy enumerates the insureds' obligations in the
event of losses or damages to the covered property.
Specifically, "Section II-Conditions, V- Conditions, E.
Your Duties After Loss" of the Policy sets forth that:

> 1. **In case of a loss to covered property,
>    you <u>must</u> see that the following is
>    done:**
>    a. Protect the property from further
>       damage;
>    b. **Make reasonable and necessary
>       repairs** to protect the property;
>       and
>    c. <u>**Keep an accurate record of repair
>       expenses**</u>;
>    d. Notify the police in case of loss
>       by theft.
>
> 2. **Prepare an <u>inventory</u> of damaged
>    personal property, showing the
>    quantity, description, actual cash
>    value and amount of loss. <u>Attach all
>    bills, receipts and related documents</u>**

**that justify the figures in the inventory**.

3. As often as we reasonably require:
   a.  Show the damaged property;
   b.  **Provide us with records and documents we request** and permit us to make copies; and
   c.  Submit to examination under oath, while not in the presence of any other "Insured," and sign the same;
   d.  Send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:
      (1.) The time and cause of loss;
      (2.) Your Interest and that of all others in the property involved and all liens on the property;
      (3.) Other Insurance which may cover the loss;
      (4.) Changes in title or occupancy of the property during the term of the Coverage Section;
      (5.) Specifications of damaged buildings and detailed repair estimates;
      (6.) **The inventory of damaged personal property** Described in F.b. above; and
      (7.) Receipts for additional living expenses incurred and records that support the fair rental value loss.

(Docket Nos. 111-1 at 49; 114 ¶ 62) (emphasis added).

64.  In addition to establishing these requirements, said section of the Policy also imposes a limitation on when legal actions can be presented against Universal. Namely,

"Section V - Conditions, H - Legal Action Against Us" states: "[n]o action can be brought **unless there has been full compliance with all of the terms under this Section** and the action is started within one year after the date of loss." (Docket No. 111-1 at 49) (emphasis added).

65. The "Conditions Applicable to all Sections" portion of Plaintiffs' Policy provides that by accepting the policy, the insured named therein agree that "**the statements in the Declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between him and the company, on any of its agents relating to this insurance.**" (Docket Nos. 111-1 at 3; 114 ¶ 118) (emphasis added).

66. In its relevant part, said section of the Policy dictates that "[t]he entire policy will be canceled if, whether before or after a loss, an "insured" has: 1. **intentionally concealed or misrepresented any material fact or circumstance;** 2. Engaged in fraudulent conduct; or 3. Made false statements; relating to this insurance." (Docket Nos. 111-1 at 2; 114 ¶ 119).

## D. Hurricane Damage to Plaintiffs' Property

67. On September 6, 2017, the eye of hurricane Irma tracked about fifty (50) nautical miles to the north of the

northern shore of Puerto Rico from 1800 UTC 6 September to 1800 UTC 7 September.[2] (Docket No. 114 ¶ 63).

68.  Two weeks later, on September 20, 2017, Puerto Rico was struck by hurricane María. Id. ¶ 71.

69.  On October 4, 2017, Mr. Rivera presented an insurance claim on behalf of the Vogels with Universal for damages allegedly caused by hurricane María to their three properties. (Docket Nos. 114 ¶ 72; 111 ¶ 9).

70.  Accordingly, the following insurance claim numbers were assigned to each property: (1) 1952235 - La Roca II; (2) 1952250 - La Roca III; and (3) 1952255 - La Roca I. (Docket Nos. 114 ¶ 72; 111 ¶ 11).

71.  On October 6, 2017, Mr. Rivera sent Mr. Vogel an email containing a report stating the estimated costs of repairs for damages caused to Plaintiffs' properties by hurricane Irma, specifically: $476,979.54 for La Roca I; $404,366.45 for La Roca II; and $427,481.93 for La Roca III. (Docket Nos. 114 ¶¶ 65, 73; 114-41).

---

[2] To support this fact, Defendants cited the National Hurricane Center's Tropical Cyclone Report: Hurricane Irma, https://www.nhc.noaa.gov/data/tcr/ AL112017_Irma.pdf. The Court thus takes judicial notice of its contents pursuant to Fed. R. Evid. 201 (b)(2). See Are-east River Sci. Park, LLC v. Lexington Ins. Co., 2014 WL 12587051, at *5 (C.D. Cal. 2014) (quotation omitted) ("The National Hurricane Center [...] is a source 'whose accuracy cannot be reasonably questioned' of weather and meteorological facts concerning tropical cyclones.").

72. Mr. Rivera's report estimated that the damages caused by the hurricane to all three properties totaled $1,308,827.92. (Docket No. 114 ¶ 66).

73. In his deposition, Mr. Rivera testified that although the report says Hurricane Irma, the damages listed were caused by Hurricane Maria. (Docket No. 127-1 at 195).

74. Mr. Rivera testified that the Vogels' properties suffered damages due to the passage of hurricane Irma. (Docket No. 114 ¶ 64).

75. Mr. Rivera testified that he never notified Universal that Plaintiffs' properties had suffered damages due to the passage of hurricane Irma nor did he file a claim with Universal for said damages. Id. ¶¶ 69-70.

76. On October 11, 2017, Mr. Vogel sent Mr. Rivera an email requesting an update regarding the damages to the properties and the status of insurance coverage. (Docket Nos 114 ¶ 74; 120-6 at 2).

77. On October 12, 2017, Mr. Rivera replied to Mr. Vogel's e-mail and attached a spreadsheet titled "Repairs at la Roca by Hurricane Irma & Maria." Said spreadsheet detailed the price and described the nature of repairs performed at the three properties in La Roca from September 6, 2017 until October 7, 2017. (Docket Nos. 114 ¶ 77; 114-44 at 2).

78.  According to Mr. Rivera's report, the repairs at La Roca
     for damages caused by hurricanes Irma and María from
     September 6, 2017 to October 7, 2017 totaled **$34,813.75**.
     (emphasis added) (Docket No. 114 ¶ 78).

79.  On November 10, 2017, Mr. Rivera sent an email to Mr.
     Vogel, with the subject "Application for Payment #1
     Hurricane María Disaster Recovery at La Roca Fajardo –
     2017." (Docket No. 114 ¶ 79).

80.  In this email, Mr. Rivera attached an "Owner Application
     for Payment" which identified all three (3) properties with
     the work in progress and a second attachment with the
     breakdown of the work in progress and finished since
     September 6, 2017 to October 31, 2017. Id. ¶ 81.

81.  In said "Owner Application for Payment", Mr. Rivera was
     charging Mr. Vogel the following amount for repairs made
     to the properties from September 6, 2017 to October 31,
     2017:

          1. La Roca I: $185,915.23

          2. La Roca II: $65,459.07

          3. La Roca III: $153,075.08

          Total:   $404,449.38

     Id. ¶ 82.

82.  Furthermore, Mr. Rivera provided a report identifying what
     percentage of the repairs had been completed and estimating

the cost of the repairs which totaled $621,302.56 for La Roca I; $432,985.98 for La Roca II; and $413,915.40 for La Roca III. (Docket Nos. 114 ¶ 80; 114-46 at 2-4).

83. On November 10, 2017, Mr. Vogel sent an email to Tony Marick ("Mr. Marick") -who substituted Mr. Barclay in managing the Vogels' affairs in Puerto Rico - and copied Mr. Rivera, acknowledging Mr. Rivera's breakdown of the costs of repairs for the three properties and requesting Mr. Marick to pay the total $404,449.38. (Docket No. 114 ¶ 83).

84. Additionally, in his email, Mr. Vogel instructed Mr. Marick and Mr. Rivera to:

> Keep in mind that this list is changing. Some items will be higher and some will be lower. The total claim to the insurance company, at this time, is $1,468,203.94. This claim is for the replacement amount cost (as my insurance states). We need to keep a file on what we pay and all the changes as they happen [...]We may shift some (insurance payments) items and do less repair (less cost), and, or we may do more repair on other items. It is our goal to have monies left over after all repairs are done and all the deductibles are applied.

(Docket Nos. 114 ¶ 84; 114-47 at 2-3).

**E. Claims Adjusting under Plaintiffs' Policy with Universal**

85. Upon receiving a claim, Universal's Claims Department assigns it to a claims adjuster. Said claims adjuster is

in charge of reviewing the claim; contacting the insured
who submitted the claim; coordinating the inspection of
the property; adjusting the claim in accordance with the
terms and limits of the policy; and extending to the
insured an offer for adjustment using the "Adjustment
Agreement    for    the    Consideration    of    the    Insurer
[Universal]." (Docket No. 114 ¶ 86).

86.  If the insured rejects the adjuster's offer, the parties
continue with the adjustment process. Id. ¶ 87.

87.  However, if the insured accepts the adjuster's offer, they
proceed to sign the "Adjustment Agreement for the
Consideration of the Insurer" form. Said form is
subsequently submitted to Universal for evaluation. Id. ¶¶
88-89.

88.  Upon evaluating the "Adjustment Agreement for the
Consideration of the Insurer" submitted by the insured,
Universal can approve, modify or deny the adjustment
pursuant to the terms of the insurance policy, or request
additional information depending on the facts of the claim.
Id. ¶ 90.

89.  Universal assigned Jaime Talbot ("Mr. Talbot"), an
independent insurance adjuster from the firm of McLarens
Panama, to inspect and evaluate Plaintiffs' three
residential properties. (Docket Nos. 114 ¶ 91; 111 ¶ 10).

90.   Mr. Rivera submitted to Mr. Talbot an estimate of damages
      allegedly caused by hurricane María for a total of
      $**1,467,703.94**.   Namely, $620,802.56 for La Roca I;
      $432,985.98 for La Roca II; and $413,915.40 for La Roca
      III. (Docket Nos. 111 ¶ 12; 114 ¶ 92).

91.   Mr. Talbot's "Preliminary and Last Reports" recommended a
      total adjusted amount of $899,048.12 for all three
      properties, specifically: $509,888.10 for La Roca I;
      $151,439.53 for La Roca II; and $237,720.49 for La Roca
      III. (Docket No. 111 ¶ 14).

92.   Said reports indicate that Plaintiffs' claim for each of
      the three properties "was received in the form of a single
      summery [sic] sheet, filed by Ebano 155, Inc., a contractor
      hired by the insured to provide reimbursement services
      after the loss." (Docket Nos. 111-3 at 3; 111-4 at 3; 111-
      5 at 3).

**F. Universal Denied Coverage pursuant to the terms of the Policy**

93.   On January 2, 2018, Jorge Amadeo Perez ("Mr. Amadeo"),
      Chief Underwriting Officer at Universal, sent an email to
      Monica Morales-Hupe ("Mrs. Morales"), Director of Personal
      Lines Underwriting at Universal, requesting her to confirm
      whether Universal had been notified that Plaintiffs'
      properties would be used as an Airbnb for rental. (Docket
      No. 114 ¶ 102).

94.   On January 2, 2018, Mrs. Morales confirmed that no petition
      had been received requesting the properties be classified
      as rented to third parties. Id. ¶ 103.

95.   On January 2, 2018, Universal sent a letter to Mr. Vogel
      notifying that:

> After having analyzed [Plaintiffs'
> insurance] policy, it is our
> understanding that it does not provide
> coverage for the majority of the losses
> claimed due to the passing of hurricane
> María. This is because the claimed
> property is being used for business
> purposes and not for personal use. The
> properties used for commercial entail
> much greater risks than those of personal
> use (family). The commercial rate has a
> different structure than the personal use
> rate.
>
> [The Policy] states that an insured place
> shall be one that is used for family
> purposes (you or your relatives-refer to
> definition A) or is rented only
> occasionally (incidentally-refer to
> definition c.6). If the property is
> rented regularly, this rental will be
> considered a business (refer to
> definition D-business) and will not fall
> under the definition of "insured
> location" under the policy.

      (Docket Nos. 114 ¶¶ 104-105; 114-21; 111 ¶ 17).

96.   In its January 2, 2018 letter, Universal referred to
      Section II Property Policy in Part I of the
      "Definitions" section, which defines the term "Insured"
      as: "[y]ou, your spouse and residents of your household
      who are (1) your relatives or, (2) other persons under the

age of 21 in the care of any person named above."
Further, the term "Insured Location" is means "any
part of premises occasionally rented to an "insured" for
uses not related to "business.'" (Docket No. 111 ¶¶ 18-
19; Docket No. 114-21).

97. The letter also referred to the definition of "Business"
in Section II Property Policy in Part I of the Definitions
section, item D(2) which defines "Business" as including
"The occasional rental or holding for rental of the
residences for dwelling purposes". (Docket No. 111 ¶ 20;
Docket No. 114-21).

98. In said letter, Universal concluded that:

> The Properties claimed under the policy
> of reference are regularly rented to
> third parties and not relatives of yours.
> Clearly the property is used for business
> purposes according to the definitions in
> the policy. These properties are even
> advertised online and via other mediums
> for this commercial purpose. Therefore,
> they do not fall under the definition of
> "insured location" in the policy and
> cannot be provided coverage for the
> damages caused by Hurricane María.

(Docket Nos. 114 ¶ 105; 114-21 at 2).

99. Furthermore, in the same letter, Universal stated that
Plaintiffs' policy only provided a limited coverage under
Section C regarding special limits of $3,000 for contents
located in the dwelling that is used for business purpose.

Accordingly, Universal offered Plaintiffs $6,000 total (that is $3,000 for the contents in La Roca I and $3,000 for the contents in La Roca III). (Docket Nos. 114 ¶ 106; 114-21 at 2).

100. On that occasion, Universal attached the corresponding "Letter of Release and Receipt of Subrogation" settling the insurance claim number 1952250 (La Roca III) for the amount of $3,000, and insurance claim number 1952255 (La Roca I) for the amount of $3,000, to be signed and returned by Plaintiffs to Universal so that it could proceed with the payment of their claims. (Docket No. 114 ¶ 107).

101. Universal closed the insurance claim number 1952235 for La Roca II without payment because Plaintiffs did not have coverage for content (i.e. unscheduled personal property) for La Roca II and thus, Universal could not make an offer to those effects. Id. ¶ 108.

102. Plaintiffs did not accept Universal's offer and instead requested reconsideration on May 30, 2018. (Docket Nos. 111 ¶ 16; 114 ¶ 109).

103. On June 28, 2018, Universal responded to Plaintiffs' request for reconsideration, reaffirming their position that the cases should be closed, and stating that:

> Universal is not liable for increased risk unless otherwise provided in writing and is made a part of the policy. […]

> [O]mitting information that is critical
> for underwriting a risk may invalidate
> the insurance contract. At the time this
> policy was written, it was stated that it
> was for personal use, this information
> was confirmed with the insurance agent,
> and therefore, Universal in good faith
> underwrote what was requested.
>
> […]
>
> [W]e took on the task of consulting with
> underwriting to determine the premium
> that was not paid, over the period that
> the client has been with us, had the
> policy been correctly underwritten as a
> commercial property. The result of this
> exercise was that, during this 11-year
> period, the insured failed to pay $71,704
> in premium for property coverage, not
> counting what liability coverage would
> have cost, which is integrated in the
> commercial package policies.

(Docket Nos. 114 ¶¶ 110-111; 119-15).

### G. Previous Insurance Claims against the Vogels

104.  On June 3, 2017, Mr. Thomas Colón ("Mr. Colón") filed a

third party liability claim with Universal against the

Vogels due to the physical damages he allegedly suffered

as a result of  hazardous materials located at the Vogels'

Fajardo Properties while they were undergoing renovations.

(Docket No. 127 ¶ 49).[3]

---

[3] This refers to paragraph number 49 of Plaintiffs' Separate Statement of
Additional Facts. (Docket No. 127 at 19-30).

105. On June 5, 2017, Universal assigned Mr. Jorge Reyes ("Mr.
     Reyes") as an internal adjuster to investigate and adjust
     Mr. Colón's claim, claim no. 1922520. Id. ¶ 50.

106. On August 21, 2017, Mr. Reyes made an entry in Universal's
     Claim Master Log stating that:

> To date, Claimant has not answered our
> letters or calls. The closing of the case
> is requested. I visited the insured
> premise and Mr. Ramón Mota Assisted me.
> He had no knowledge of the alleged event.
> In front of me, he asked two other
> employees who were there that day and
> they did not know about it either. Ramón
> gave me the telephone number of Richard
> Rodriguez, person in charge of the rents
> [...] who told me that he does not know
> anything about the event, either. In
> addition, he looked in his books and has
> no guest by that name.

(Docket No. 127-5 at 7-8).

107. On **October 1, 2017**, Mr. Reyes issued his investigation
     report. Therein, he detailed that he personally visited
     the insured premise, that the Vogels had three residences
     in one place and that "[t]hese are residences that the
     insured uses personally and also rents them." Id. at 12.

### IV. APPLICABLE LAW

The Insurance Code of Puerto Rico (the "Insurance Code")
governs insurance contracts, known as policies, in Puerto Rico.
See P.R. Laws Ann. tit. 26, §§ 1101-1137. Under said Insurance
Code, insurance contracts are to be "construed according to the

entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any lawful rider, endorsement, or application attached to and made a part of the policy." Id. § 1125. Generally, "insurance contracts are considered contracts of adhesion that are liberally interpreted in favor of the insured." Metlife Capital Corp. v. Westchester Fire Ins. Co., 224 F. Supp. 2d 374, 382 (D.P.R. 2002) (citing Quiñones Lopez v. Manzano Pozas, 141 D.P.R. 139, 155 (1996); Rosario v. Atl. Southern Ins. Co., 95 D.P.R. 759 (1968)).

When the Insurance Code fails to provide the "interpretative approach" required for a particular controversy, courts look to the Puerto Rico Civil Code for a supplemental source of law guiding contract interpretation. See Marina Aguila v. Den Caribbean, Inc., 490 F. Supp. 2d 244, 248 n. 5 (D.P.R. 2007). The Puerto Rico Civil Code dictates that "[if] terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed." P.R. Laws Ann. tit. 31, § 3471. In such cases, "the court should confine itself to a literal application of the unambiguous terms of the contract." Gonzalez v. John Hancock Mut. Life Ins. Co., 927 F.2d 659, 660 (1st Cir. 1991) (internal quotations and edits omitted). "Under Puerto Rican law, an agreement is 'clear' when it can 'be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation[.]'" Executive

Leasing Corp. v. Banco Popular de Puerto Rico, 48 F.3d 66, 69 (1st
Cir. 1995); see also Heirs of Ramírez v. Superior Court, 81 P.R.R.
347, 351 (1959). In terms of insurance contracts in particular,
the District of Puerto Rico has held that although ambiguities
arising from an insurance policy should "be resolved in the manner
least favorable to the insurer […] this praxis **does not compel or
require courts to interpret a clear, unambiguous clause that favors
the insurer in a manner that would benefit the insured.**" Metlife
Capital Corp., 224 F. Supp. 2d at 382 (emphasis added).

It is worth noting that "[a]mbiguity does not exist simply
because the parties disagree about the proper interpretation of a
policy provision." Hoffman Garcia v. Metrohealth, Inc., 246 F.
Supp. 3d 527, 530 (D.P.R. 2017). Instead, ambiguity "may be found
where the policy's language is susceptible to more than one
rational interpretation." Id. (quoting Clark School for Creative
Learning, Inc. v. Philadelphia Indem. Ins. Co., 734 F.3d 51, 55
(1st Cir. 2013)). Moreover, whether an insurance policy's terms,
conditions, and exclusions are clear and unambiguous is a matter
of law for courts to determine. See Marina Aguila, 490 F. Supp. 2d
at 249 (quoting Littlefield v. Acadia Ins. Co., 392 F.3d 1, 10
(1st Cir. 2004)).

## V. ANALYSIS

In the case at bar, Plaintiffs request that the Court enter
judgment in their favor, declaring that the extensive hurricane

damage suffered by their three properties is covered under their
Insurance Policy issued with Universal. (Docket No. 110).
Universal contends that it is not liable for coverage because: (1)
Plaintiffs have a personal property insurance policy but were using
the properties for a commercial purpose; and (2) Plaintiffs failed
to comply with their obligation under the policy of providing the
documentary evidence necessary to substantiate their claims.
(Docket No. 113).

Plaintiffs argue that La Roca I, II, and III are identified
as insured locations in the Declarations pages of the Policy, thus
qualifying for coverage. (Docket No. 110 at 4). The Insurance
Policy is unambiguous when defining what constitutes the "insured
location." Section II of the Policy **explicitly excludes** any part
of the premises that is being rented for business use, including
occasional rentals, from this definition. (Facts ¶¶ 56-57).
Moreover, the Policy repeatedly identifies La Roca I as a principal
residence and La Roca II and III as second "non-rented" residences
and "non-rented property." (Facts ¶¶ 19, 22, 24).

It is uncontested that since 2016, Plaintiffs *were renting* La
Roca I, II, and III, for $1,400.00 to $3,000.00 per night, via
Airbnb, HomeAway, VRBO, and other analogous property rental
platforms. (Facts ¶¶ 42-43). This "occasional rental" of the
residences necessarily constitutes an impermissible "business"
pursuant to the Policy. (Fact ¶ 57).

On this ground alone, **the Court must find that the properties no longer qualify for coverage under the Policy**. *See* <u>Grooms v. Liberty Mut. Fire Ins. Co.</u>, 2009 WL 2512408, at *2 (W.D. Wash. 2009) ("Because the policy language unambiguously excludes property coverage for the [insured] building when used for business purposes and not as a residence, the Court must GRANT Defendant's request for declaratory judgment [that plaintiffs are not entitled to coverage].") Moreover, Defendant evinced how the Puerto Rico Supreme Court routinely differentiates between the residential and commercial use of property. (Docket No. 113 at 10-11, quoting <u>Soto Vázquez v. Vázquez Torres</u>, 138 D.P.R. 282, 292 (1995) and <u>Residentes Parkville Sur v. Díaz Luciano</u>, 159 D.P.R. 374, 390 (2003)). A personal insurance policy, such as the one at bar which exclusively contemplates and covers non-rented residences, **cannot be said to cover properties used for consistent commercial use**. Doing so would contravene the unambiguous language of the Policy.

This is heightened by the fact that after the Vogels began renting all three La Roca properties in 2016, Plaintiffs renewed their Policy, with the same terms prohibiting occasional rentals, in **February 19, 2017**. (Fact ¶ 50). Neither Plaintiffs nor anyone else on their behalf notified Universal regarding the short-term rental business use of Plaintiffs' properties. (Fact ¶ 48).

Pursuant to its own provision, the Policy "will be canceled" if prior to a loss, the insured "1. **intentionally concealed or**

**misrepresented any material fact or circumstance;** 2. Engaged in fraudulent conduct; or 3. Made false statements; relating to this insurance." (Fact ¶ 66). Furthermore, the Policy also provides that any increase in risk or hazard within the insureds' control needed to be notified to Universal in writing, and added to the Policy, in order for Universal to remain liable for losses occurring while the hazard is increased.(Fact ¶ 62).

Plaintiffs failed to comply with the clear terms of the Policy by not notifying the material fact that their three properties were routinely being used for short-term rentals. Moreover, they took no steps to notify Universal regarding the change in use, and thus risk, of their properties. (Fact ¶ 48).

Plaintiffs' argument that Universal was "notified" of the short-term rentals by Mr. Reyes' entry in the Claim Master Log and subsequent report does not pass muster either. (Facts ¶¶ 104-106). Plaintiffs could not simply delegate *their* responsibility to notify Universal of any increase or change in material facts to an adjuster reviewing a claim. Plaintiffs renewed their Policy with Universal in February 2017, thereby renewing their duty to inform Universal of any change in use of their properties. (Fact ¶ 50). It is also worth noting that Mr. Reyes' formal report was not completed until October 1, 2017, after the passing of Hurricanes Irma and Maria. (Fact ¶ 107).

The Court cannot contort "clear, unambiguous clause[s] that favo[r] the insurer in a manner that would benefit the insured." Metlife Capital Corp., 224 F. Supp. 2d at 382. Here, the Policy explicitly excludes occasional rentals for business purposes from its definition of the insured location. Therefore, La Roca I, II, and III are not eligible for coverage pursuant to the Policy. Accordingly, Universal did not commit a breach of contract by refusing to provide coverage under the Policy.

## VI. CONCLUSION

In light of the foregoing, the Court **DENIES** Plaintiffs' *Motion for Summary Judgment on the Coverage Issue* at Docket No. 110 and **GRANTS** Defendant's *Motion for Summary Judgment* at Docket No. 113. The case is hereby **DISMISSED** with prejudice. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 24th day of March 2021.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge